ROBBINS ARROYO LLP
GEORGE C. AGUILAR (126535)
GREGORY E. DEL GAIZO (247319)
STEVEN M. MCKANY (271405)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: gaguilar@robbinsarroyo.com
        gdelgaizo@robbinsarroyo.com
        smckany@robbinsarroyo.com

[Additional Counsel on Signature Page]

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DAWN COBBS, Individually and on
Behalf of All Others Similarly
Situated,

                    Plaintiff,

        v.

WALGREEN CO. and
WALGREENS BOOTS
ALLIANCE, INC.,

                    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No:   '17 CV 1089 AJB  JMA

CLASS ACTION COMPLAINT FOR:

(1) VIOLATIONS OF THE
CALIFORNIA UNFAIR
COMPETITION LAW;
(2) VIOLATIONS OF THE
CALIFORNIA CONSUMER LEGAL
REMEDIES ACT;
(3) UNJUST ENRICHMENT; AND
(4) NEGLIGENT
MISREPRESENTATION.

DEMAND FOR JURY TRIAL

Plaintiff Dawn Cobbs ("Plaintiff"), by his undersigned attorneys, individually and on behalf of all others similarly situated ("Class," as defined below), based on personal knowledge as to herself and upon information and belief and the investigation of his counsel as to all other matters, brings this class action against Defendants Walgreen Co. and Walgreens Boots Alliance, Inc. (collectively, "Defendants" or "Walgreens"), and alleges the following:

## NATURE OF THE ACTION

1.     This action concerns Walgreens' deceptive and unfair pricing scheme to overcharge customers with third-party health care plans on their purchases of generic prescription drugs at Walgreens pharmacies.

2.     Walgreens is the second largest pharmacy chain in the United States, operating more than 8,000 retail pharmacies in all 50 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.  Walgreens interacts with ten million customers in its stores and online each day, and approximately 76% of the population of the United States lives within five miles of a Walgreens pharmacy.

3.     In October 2015, Walgreens announced that it would be acquiring Rite Aid Corp., one of its main rivals and the third largest pharmacy chain in the United States.  If that acquisition is consummated, Walgreens will become the largest pharmacy chain in the United States with a significantly expanded geographic reach through the operation of its over 13,000 pharmacy stores.

4.     In fiscal year 2016, Walgreens filled over 928 million prescriptions on a 30-day adjusted basis and its United States retail pharmacy division earned approximately $83.8 billion in sales.  Prescription drugs accounted for approximately 67% of those sales, and like other major retail pharmacies, generic drugs accounted for the vast majority of the total prescriptions dispensed by Walgreens.  According to the Generic Pharmaceutical Association's *2016 Generic Drug Savings and Access in the United States Report*, generic drugs accounted for 89% of prescriptions dispensed in the United States.

5.     A generic drug is a pharmaceutical drug that is the equivalent of a brand-name drug in dosage, strength, route of administration, quality, performance, and intended use.  Generic drugs typically cost less than their brand-name counterparts and have saved both consumers and health care plans hundreds of billions of dollars over the last decade.

6.     Approximately 90% of all United States citizens are enrolled in a private or public health care plan that covers some or all medical and pharmaceutical expenses.  In almost every one of these plans, the cost of prescription drugs is shared between the third-party payor (*i.e.*, the health insurance plan) and the actual user of the drug (*i.e.*, the plan participant).

7.     When a plan participant fills a prescription at a pharmacy under a third-party health care plan, the plan pays a portion of the cost, and the plan participant pays the remaining portion of the cost directly to the pharmacy, either as a copayment, coinsurance, or contracted rate towards the plan's deductible ("copayment").  Because of the potential cost savings associated with the purchase of generic drugs, third-party payors incentivize plan participants to purchase generic drugs (if available) instead of their brand-name drug equivalents by offering a lower price, which in turn, results in a lower copayment.

8.     Walgreens pharmacies collect the copayment from the plan participant at the time the prescription is filled at a pharmacy.  Importantly, by law, Walgreens cannot charge a copayment that exceeds its "usual and customary" price, which is generally defined within the pharmaceuticals industry as the cash price offered to the general public by the pharmacy for the same drug.[1]  Plaintiff alleges, however, that Walgreens engages in a false, deceptive, and unfair pricing scheme that does exactly

---

[1]     The Seventh Circuit Court of Appeals recently affirmed this definition in the case of *United States ex rel Garbe v. Kmart Corp.*, 824 F.3d 632, 643 (7th Cir. 2016) ("*Kmart*").

what the law prohibits.

9. At bottom, this action concerns Walgreens' illegal practice of overcharging customers enrolled in public or private health care plans for generic prescription drugs by submitting to third-party payors claims for payment at prices that Walgreens has knowingly and intentionally inflated above its "usual and customary" prices. As a result, customers who purchase generic prescription drugs through third-party plans pay copayments that are significantly more than Walgreens' "usual and customary" prices for those same drugs.

10. The lynchpin of Walgreens' scheme is its Prescription Savings Club ("PSC"), a prescription savings program that allows cash-paying customers – those who pay for drugs without using insurance – to purchase certain prescription generic drugs at discounted prices. Specifically, the PSC allows cash-paying customers to purchase 500 of the most commonly prescribed generic drugs listed on Walgreens' special formulary (attached hereto as Exhibit A) at tiered prices levels of $5, $10, and $15 for 30-day prescriptions and $10, $20, and $30 for 90-day prescriptions (the "PSC Prices"). The PSC Prices, however, are often significantly lower than the "usual and customary" prices that Walgreens reports to health insurance companies, and thus, the amounts that individuals using insurance must pay for the drugs in the form of a copayment.

11. Any customer of Walgreens pharmacies, except for Medicare or Medicaid beneficiaries, are eligible to participate in the PSC. Walgreens does not otherwise limit eligibility for, or duration of the availability of, the PSC Prices for the prescription generic drugs at issue – *other than prohibiting PSC participants from using insurance when purchasing the drugs*. The Seventh Circuit's decision in *Kmart* makes clear that under these circumstances the PSC Prices fit squarely within the accepted industry meaning of usual and customary prices, and thus, represent Walgreens' actual usual and customary prices for the drugs. *See id.* at 645.

12. Accordingly, Walgreens was required to report to third-party payors the PSC Prices as Walgreens' usual and customary prices for the prescription generic drugs. However, since the PSC was created in 2007, Walgreens has purposefully disregarded the PSC Prices in setting its "usual and customary" prices for the drugs when they are sold to customers using insurance for their purchase. Instead, Walgreens has submitted falsely inflated "usual and customary" prices for the drugs to third-party payors, and in the process, overcharged customers paying for the drugs with insurance by collecting falsely inflated copayments.

13. Thus, using the PSC as its vehicle, Walgreens has effectively created a discriminatory pricing scheme, whereby customers enrolled in the PSC who are not using insurance when purchasing a prescription generic drug are able to pay the lower PSC Price, while those customers using insurance must pay the higher and artificially inflated "usual and customary" price.

14. Therefore, the PSC not only allows Walgreens to maintain and increase its market share by fending off discounted prices from its competitors, but more importantly, it provides a mechanism for Walgreens to hide its actual "usual and customary" prices from third-party payors so that it can continue to collect higher reimbursement payments from third-party payors and higher copayments from plan participants who fill their prescription at Walgreens pharmacies.

15. By charging amounts for prescription generic drugs that are above the PSC Prices for those same drugs, Walgreens is unlawfully overcharging plan participants and third-party payors – in many cases by *more than three or four times* the actual "usual and customary" prices. Accordingly, Walgreens' misconduct has caused Plaintiff and the other Class members to suffer significant monetary damages.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100

1  putative Class members, and the aggregate amount in controversy exceeds

2  $5,000,000, exclusive of interest and costs.   The Court also has subject matter

3  jurisdiction over Plaintiff and the proposed Class' claims pursuant to 28 U.S.C.

4  §1367(a).

5       17.   Venue is proper in this District pursuant to 28 U.S.C. §§1391(b)-(d)

6  because a substantial part of the events or omissions giving rise to Plaintiff and the

7  proposed Class claims occurred in this District, Plaintiff is a residents of this District,

8  and Defendants are otherwise subject to personal jurisdiction in this District given

9  their significant contacts to this District.

10                                **THE PARTIES**

11      18.   Plaintiff Dawn Cobbs is, and at all times relevant hereto has been, a

12  citizen of and domiciled in San Diego, California.   Ms. Cobbs purchased prescription

13  generic drugs from Walgreens pharmacies located in California.   Ms. Cobbs carried

14  private health insurance at the times that she purchased the prescription generic drugs

15  from the Walgreens pharmacies at issue.   The prescription generic drugs that Ms.

16  Cobbs purchased are contained on the PSC formulary attached as Exhibit A.   Ms.

17  Cobbs purchased drugs contained under Tiers 1, 2, and 3 of the PSC formulary.

18  Walgreens charged its cash-paying customers its "usual and customary" prices of $5

19  (Tier 1), $10 (Tier 2), and $15 (Tier 3) for a 30-day supply of the same prescriptions

20  that Ms. Cobbs purchased.   However, because Walgreens submitted to Ms. Cobbs'

21  insurance a purported "usual and customary" price fraudulently inflated above its true

22  "usual and customary" price—the price Walgreens offers under the PSC – Ms. Cobbs

23  paid copayments that were substantially higher than the $5 for a Tier 1 30-day

24  supply, and significantly more than the copayment would have been had Walgreens

25  reported the true "usual and customary" price for all the drugs to Ms. Cobbs'

26  insurance.   As a result, Ms. Cobbs has been injured.   Ms. Cobbs anticipates filling

27  future prescriptions for these generic drugs at a Walgreens pharmacy, and thus, faces

28  the prospect of paying additional inflated copayments in the future if Walgreens

continues its wrongful conduct.

19.     Ms. Cobbs paid the above amounts on the reasonable assumption that the "usual and customary" prices reported by Walgreens were the actual "usual and customary" prices paid by customers that do not have any form of prescription drug coverage from a third-party payor, and would not have paid those inflated amounts but for Walgreen's wrongful conduct.

20.     Defendant Walgreen Co. ("Walgreen Co.") is an Illinois corporation with its headquarters located at 200 Wilmot Road, Deerfield, Illinois.   Until December 31, 2014, Walgreen Co. had no corporate parent; however, on December 31, 2014, Walgreen Co. became a wholly owned subsidiary of Walgreens Boots Alliance, Inc. ("WBA") pursuant to a reorganization merger agreement ("Reorganization").

21.     Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation with its headquarters located at 108 Wilmot Road, Deerfield, Illinois.  On December 31, 2014, WBA became the successor of Defendant Walgreen Co., pursuant to the Reorganization, whereby WBA became the direct parent holding company of Walgreen Co., which, in turn, became a wholly owned subsidiary of WBA.

22.     WBA exercises complete control over Walgreen Co. and its business operations.  Immediately prior to the Reorganization, Walgreen Co. stockholders became stockholders of WBA, through the automatic conversion of shares of Walgreen Co. common stock into shares of WBA common stock on a one-for-one basis.  WBA's public filings report the financial and operational positions Walgreen Co. and its subsidiaries for periods prior to December 31, 2014, and of WBA and its subsidiaries, including Walgreen Co., for periods from and after the effective time of the Reorganization on December 31, 2014.  All WBA profits are derived from its wholly owned operating subsidiaries, such as Walgreen Co., whose financial results are reported in the Retail Pharmacy USA section of WBA's public filings.  WBA's Co-Chief Operating Officer ("COO"), Alexander W. Gourlay, is also the President of

Walgreen Co., and as WBA's COO, Mr. Gourlay is responsible for the day-to-day operation and oversight of Walgreen Co.

**BACKGROUND**

**The Process for Paying for Prescription Drugs**

23.     The majority of patients in the United States have a health care plan (either private or public) that covers all or a portion of their medical and pharmaceutical expenses, known as a third-party payor.  Most plans require plan participants to pay a portion of their drug costs out-of-pocket.  These out-of-pocket expenses include copayments, co-insurance, and/or deductibles.

24.     Even though plan participants cannot and do not negotiate the price charged by pharmacies such as Walgreens for prescription drugs, and further, do not negotiate the copayment price for the drug in any given transaction, they are required to pay to Walgreens a copayment amount in order to receive the prescription.

25.     The National Council for Prescription Drug Programs ("NCPDP")[2] sets the industry standards for the electronic transmission of pharmacy claims to third-party payors.[3]  Walgreens follows this uniform process at their pharmacies for each prescription drug transaction.

_____

[2] NCPDP is a non-profit organization that develops industry standards for electronic healthcare transactions used in prescribing, dispensing, monitoring, managing, and paying for medications and pharmacy services.  Its membership is made up of approximately 1,500 stakeholders from across the pharmaceutical industry, including pharmacies, pharmacists, health plans, and government agencies.

[3] Congress has codified and adopted the NCPDP standards through federal legislation, including Health Insurance Portability and Accountability Act ("HIPAA"), Medicare Modernization Act, Health Information Technology for Economic and Clinical Health, and Meaningful Use. For example, HIPAA requires uniform methods and codes for exchanging electronic information with health insurance plans.  These standards are referred to as the NCPDP Telecommunications Standard.  HIPAA also requires prescribers follow the NCPDP SCRIPT Standards when prescribing drugs under Medicare Part D.

26.     When a customer fills a prescription at a Walgreens pharmacy, anywhere in the United States, the pharmacist or pharmacy technician enters the prescription information and any applicable insurance or benefit information into Walgreens' computerized claims.   The pharmacist or pharmacy technician also enters in key information about the customer, such as his/her name.   This information is then sent to the customer's third-party payor (or an agent of the third-party payor).   Walgreens charges the customer the copayment at the time the customer makes the purchase and the third-party payor covers the remaining cost of the prescription.

27.     NCPDP provides a standardized form for Walgreens pharmacies to fill out and send to third-party payors when filing prescriptions.   The form includes Field No. 426-DQ, where Walgreens is required to report its "usual and customary" price of the prescription being filled.   NCPDP defines the term "usual and customary" as the "[a]mount charged cash customers for the prescription exclusive of sales tax or other amounts claimed."   California Welfare and Institutions Code 14105.455 similarly defines "usual and customary" as the lesser of either the lowest price reimbursed to the pharmacy by other third-party payors in California or the lowest price routinely offered to any segment of the general public.

28.     Based on the data reported by Walgreens on NCPDP's standard forms, third-party payors identify the copayment amount that the customer must pay to Walgreens in a specific prescription transaction.   The copayment amount is a portion of the total drug price and cannot exceed the drug price.   In addition, the copayment cannot exceed Walgreens' "usual and customary" price of the drug.   After the copayment amount is paid by the customer, the remainder of the drug price is reimbursed to the Walgreens by the third-party payor.

29.     In some situations, however, the copayment may only be charged as a percentage of the "usual and customary" price.   For instance, if a third-party payor's negotiated price for a specific drug is $40 with the customer responsible for 25% of the drug as his or her copayment, but the "usual and customary" price of the drug is

only $20, the $20 price would take the place of the negotiated rate and the customer would only pay a copayment of $5 (25% of $20).

30. Walgreens is well aware of both the definition of usual and customary, and how the "usual and customary" price of a particular prescription drug is ascertained. Indeed, as late as 2011, Walgreen Co. owned Walgreens Health Initiative Inc. ("WHI"), a pharmacy benefits manager ("PBM"),[4] which defined "usual and customary" in its manual as the "cash price [for the prescription drug] including all applicable customer discounts, coupons or sale price which a cash-paying customer would pay at the pharmacy." In addition, WHI directed the pharmacies in its network to use the standard NCPDP form containing the "usual and customary" field discussed above.

**Big Box Retailers Exert Substantial Price Pressure on Generic Drugs**

31. In 2006, large "big box" retailers with pharmacy departments began offering hundreds of generic prescription drugs at significantly reduced prices. For example, in September 2006, Wal-Mart began charging $4 for a 30-day supply and $10 for a 90-day supply of the most commonly prescribed generic drugs. In November of that same year, Target began charging $4 for a 30-day supply and $10 for a 90-day supply of such prescription generic drugs. Other retailers with pharmacy departments soon followed suit.

32. Notably, in the wake of Wal-Mart's decision to substantially reduce the prices of its prescription generic drugs, the Center for Medicaid & Medicare Services ("CMMS") specifically stated that it would treat Wal-Mart's new lower prices as the "usual and customary" prices for those drugs and use the prices as the basis for paying claims for prescription drug benefits. Wal-Mart and Target properly reported to third-party payors these reduced prices as their "usual and customary" prices for

_____

[4] PBMs are basically middle men that go between the payors and everyone else in the healthcare industry.

the prescription generic drugs.

33.     On information and belief, in 2007, in response to the big box retailers' decision to reduce the prices of many prescription generic drugs, Walgreens started the PSC discount drug program.  Walgreens charges individuals $20 and families $35 per year to join the PSC.  In exchange, Walgreens, through the PSC, allows cash-paying customers to purchase prescription generic drugs on their formulary list for $5, $10, and $15 for 30-day prescriptions and $10, $20, and $30 for 90-day prescriptions, depending on the drug's tier classification.  There are over 500 generic drugs on the formulary list and the list encompasses a number of the most widely prescribed generic drugs.

34.     The PSC is not a special, limited, or one-time offer.  It is also not a third-party plan, insurance, or a substitute for insurance.  Rather, Walgreens has continuously offered the PSC for multiple benefit years.  Importantly, *any* cash paying customer that is not on Medicare or Medicaid can join the PSC and avail themselves of the discounted prices.

35.     Accordingly, the price for prescription generic drugs that those enrolled in the PSC pay is the price that Walgreens offers to their customers (i.e., the general public).  The CMMS Manual notes that "where a pharmacy offers a lower price to its customers throughout a benefit year" the lower price is considered the "usual and customary" price, rather than a one time "lower case price," even when a customer uses a discount card to make the purchase.[5]

36.     Accordingly, the PSC Prices are the "usual and customary" prices for the prescription generic drugs on Walgreens' PSC formulary.  Walgreens' own explanation of the "usual and customary" price, as adopted by WHI, mandates this

---

[5] Centers for Medicare & Medicaid Servs., *Medicare Prescription Drug Benefit Manual*, Ch. 14-Coordination of Benefits, at19 n.1 (2006), https://perma.cc/MW6A-H4P6.

determination.  So too does the NCPDP and California's Health and Welfare Code.
And as mentioned above, the Seventh Circuit agrees, even explaining that the "'usual
and customary' price requirement should not be frustrated by so flimsy a devise as [a
pharmacy's] 'discount program.'"  *Kmart*, 824 F. 3d at 645.

## WALGREENS ILLEGALLY INFLATES ITS "USUAL AND CUSTOMARY" PRICE

37.   Although Walgreens sought to retain and attract cash-paying customers
by offering discounted prices on prescription generic drugs through the
implementation of the PSC program, it did not want to lose revenues by offering
those same discounted prices to customers using insurance to make their prescription
drug purchases.

38.   Thus, under the guise that its PSC program was not available to the
general public, Walgreens unlawfully continued to report their previous higher "usual
and customary" prices to third-party payors.  By reporting the artificially inflated
"usual and customary" prices to third-party payors, Walgreens was able to collect
artificially inflated copayments from consumers, as well as artificially inflated
residual amounts from third-party payors.

39.   Walgreens knew that third-party payors calculate the price for
prescription drugs to be paid to the pharmacy based on whether the "usual and
customary" price submitted is less than or greater than the negotiated price between
Walgreens and the third-party payor.  Walgreens also knew that if the "usual and
customary" price for a particular prescription drug is less than the negotiated price,
Walgreens could not charge third-party payors a drug price that was greater than the
"usual and customary" price.  Walgreens' knowledge of these facts cannot be denied
given its prior ownership of WHI, who dealt extensively with this issue as Walgreens'
PBM.

40.   Notwithstanding the knowledge garnered through its relationship with
WHI, Walgreens knew the prices it could charge to customers using insurance to

- 11 -

purchase their prescription medications from its dealings and contractual relationships with the third-party payors themselves. Indeed, third-party payors' pharmacy agreements and manuals state, in detail, how a plan participant's copayment is determined. These agreements and manuals specifically contemplate a situation where the "usual and customary" price is less than the negotiated amount, and explicitly forbid Walgreens from charging a copayment in excess of the "usual and customary" price under such circumstances. Walgreens is in possession of these documents and is aware of their contents. Further, Walgreens' own transaction data contain reimbursements adjudicated under the above formula and other rules imposed by the third-party payors, all which reflect general industry standards.

41. Moreover, Walgreens need look no further than to its direct competitors, such as Wal-Mart, Target, and Costco, who all, on information and belief, correctly report the discounted prices offered through their respective prescription drug savings programs as their "usual and customary" prices.

42. Walgreens tried to avoid their contractual obligations and accepted industry standards (not to mention federal and state law as they concern Medicare and Medicaid and their state equivalents) by implementing the PSC program, and instead of reporting the lower PSC Prices to third-party payors, knowingly and intentionally reported false and inflated "usual and customary" prices. In doing so, Walgreens created a new category of cash-paying customers—those purchasing prescription generic medications through the PSC—while avoiding the lowering of drug prices charged to third-party payors and their plan participants.

43. As previously explained, however, the PSC Prices for the cash-paying customers are the actual "usual and customary" prices charged by Walgreens for the prescription generic drugs on the PSC formulary. Nonetheless, Walgreens conceals the PSC Prices from third-party payors, and instead of submitting the PSC Prices as its "usual and customary," continues to submit the higher prices as its purported "usual and customary" price to third-party payors.

44.     Walgreens' scheme is made possible because third-party payors are not privy to the prices Walgreens charges their cash-paying customers, including those using the PSC program to purchase their prescription generic drugs.  Thus, third-party payors have no way of determining on their own whether the price Walgreens submits as its "usual and customary" price is actually the price offered to cash-paying members of the general public, and therefore, are unaware that the price being submitted by Walgreens is not the actual "usual and customary" price, but rather an artificially inflated amount.

45.     On information and belief, the majority of customers who purchase the prescription generic drugs that are contained on the PSC formulary do so using the PSC program, and thus, the majority of Walgreens' cash-paying customers pay the PSC Prices for such drugs.

46.     In failing to report the more common PSC Prices as its "usual and customary" prices, Walgreens continues to report prices that are significantly higher than the prices it offers to the general public.

47.     Beginning in 2007, and continuing through the present, Walgreens has reported to third-party payors artificially inflated "usual and customary" prices for the same prescription generic drugs that Walgreens offers for lower prices under the PSC program.  Walgreens has thereby caused (and continues to cause) plan participants (including Plaintiff and other Class members) to pay false and inflated copayments for prescription generic drugs.

48.     Importantly, the inflated "usual and customary" prices that Walgreens reports to third-party payors do not vary based on any particular third-party plan.  In fact, for the same strength and quantity of a given drug, Walgreens reports the same "usual and customary" prices to all third-party payors, despite any variations in their respective plans.

49.     As part of its scheme, Walgreens has reported "usual and customary" prices for generic prescription drugs that more than double the "usual and customary"

prices reported by some of its most significant competitors and its own PSC Prices. The table below shows "usual and customary" prices submitted to California's Medicaid program for the purposes of claims adjudication.

| Drug | Discounted Prices Near 92101 Zip Code (Downtown San Diego, CA)[1] | | | | | |
| | Vons | Walmart | Costco | Target | Walgreens | Walgreens (PSC)[2] |
|---|---|---|---|---|---|---|
| Carvedilol 6.25 mg 60 Tablets | $10.40 | $11.37 | $12.50 | $14.38 | $28.55 | $10.00 |
| Lisinopril 20 mg 30 Tablets | $7.94 | $6.84 | $7.92 | $8.58 | $14.00 | $5.00 |
| Lisinopril/HCTZ 20, 12.5 mg 30 Tablets | $8.41 | $7.54 | $8.63 | $9.48 | $14.25 | $10.00 |
| Metformin HCL 1,000 mg 60 Tablets | $11.18 | $8.63 | $9.73 | $10.88 | $24.53 | $5.00 |
| Metoprolol Tartrate 50 mg 60 Tablets | $8.72 | $9.04 | $7.96 | $8.63 | $13.65 | $10.00 |
| Warfarin Sodium 5 mg 30 Tablets | $9.19 | $9.70 | $9.96 | $9.45 | $14.56 | $10.00 |
| Fluoxetine HCL 20 mg 30 Capsules | $11.52 | $9.69 | $11.74 | $13.09 | $23.50 | $5.00 |

50.    As demonstrated above, the "usual and customary" prices submitted by Walgreens to third-party payors are undeniably and unlawfully inflated.

51.    In fact, Walgreens highlights on its website the significant savings that members of PSC program receive – savings that are not available to those customers using insurance to purchase their prescription generic drugs.

## Guaranteed savings. Risk-free membership.

If you don't save at least the cost of your prescription card membership fee in one year, we'll give you the difference.[1]

| Average Savings[2] | Tier 1 ($10) | Tier 2 ($20) | Tier 3 ($30) |
|---|---|---|---|
| 90 day supply of a value-priced generic | $50.41 | $52.54 | $118.08 |

| Sample Savings | Without Membership | With Membership | Annual Savings |
|---|---|---|---|
| FLUTICASONE Nasal Spray | $42.00 | $15.00 | $324.00 |
| LISINOPRIL Tablet | $47.99 | $12.00 | $143.96 |

52.     But, since the PSC Prices are, in fact, the "usual and customary" prices Walgreens charges, Plaintiff and the other members of the Class should have also received these reduced prices when purchasing the prescription generic drugs at issue.

53.     Walgreens does not inform customers who use their insurance benefits to purchase generic prescription drugs (including Plaintiff and the other members of the Class) that, for the drugs, the PSC Prices Walgreens charges cash-paying customers, are lower than the copayments Walgreens charges.  Walgreens either wrongly conceals or omits such information by failing to tell customers using insurance about the PSC program, or by misrepresenting to those customers that the PSC program would not apply to their purchases.

54.     On information and belief, there have been millions of instances where Walgreens intentionally submitted fraudulently inflated "usual and customary" pricing information to third-party payors in connection with prescription generic drug

purchases made by Plaintiff and other members of the Class during the class period, including the specific transactions by Plaintiff described herein.

### CLASS ALLEGATIONS

55.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(b)(3), on behalf  of himself and the following national Class and California state Subclass:

CLASS

All persons or entities in the United States and its territories who, between January 2007 and the present ("Class Period"), paid for, in full or in part, a prescription generic drug included on the PSC formulary and were insured for the purchase through a third-party payor.

SUBCLASS

All persons or entities in the state of California who, during the Class Period, paid for, in full or in part, a prescription generic drug included on the PSC formulary and were insured for the purchase through a third-party payor.

The national Class and California state Subclass are collectively referred to as the "Classes."

56.     Excluded from the Classes are Walgreens, its officers, and directors.

57.     The Classes consist of at least hundreds of thousands, and likely millions, of individual Walgreens customers, making joinder impractical, in satisfaction of Fed. R. Civ. P. 23(a)(1).  The exact size of the Classes, and the identities of the individual members thereof, are ascertainable through Walgreens' records, including, but not limited to, its billing and collection records.

58.     The claims of Plaintiff are typical of the Classes.  The claims of Plaintiff and the Classes are based on the same legal theories and arise from the same unlawful and willful conduct, resulting in the same injury to the Plaintiff and the Classes.

59.     The Classes have a well-defined community of interest.  Walgreens has acted and failed to act on grounds generally applicable to the Plaintiff and the Classes, thus requiring the Court's imposition of uniform relief to ensure compatible

standards of conduct toward the Classes.

60.  There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect only individual Class members within the meaning of Fed. R. Civ. P. 23(a)(2) and 23(b)(2).

61.  Common questions of fact and law affecting members of the Classes include, but are not limited to, the following:

(a)  whether Walgreens artificially inflated the "usual and customary" prices that it reported to third-party payors pursuant to the NCPDP reporting standard;

(b)  whether Walgreens omitted and concealed material facts from their communications and disclosures with third-party payors and plan participants regarding its pricing scheme;

(c)  whether Walgreens has wrongfully overcharged and continues to overcharge copayments to hundreds of thousands, and likely millions, of plan participants (including Plaintiff and the Classes) who purchased a prescription generic drug listed on Walgreens' PSC formulary at its pharmacies around the country;

(d)  whether Walgreens has engaged in, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts and/or practices in connection with the pricing and sale of prescription generic drugs;

(e)  whether, as a result of Walgreens' misconduct, Plaintiff and the Classes have suffered damages, and, if so, the appropriate measure of damages to which they are entitled; and

(f)  whether, as a result of Walgreens' misconduct, Plaintiff and the Classes are entitled to injunctive, equitable, and/or other relief, and, if so, the nature of such relief.

62.     Absent a class action, most of the members of the Classes would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

63.     Plaintiff will fairly and adequately represent and protect the interests of the Classes.  Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other respective members of the Classes, and have the financial resources to do so.  Neither Plaintiff nor her counsel have any interests adverse to those of the other members of the Classes.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

64.     Plaintiff and the other members of the Classes had neither actual nor constructive knowledge of the facts constituting their claims for relief until recently.

65.     Plaintiff and the other members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the unlawful conduct alleged herein until recently.

66.     Walgreens engaged in a secret scheme that did not reveal facts that would have put Plaintiff or the other members of the Classes on inquiry notice that Walgreens was charging inflated prices for prescription generic drugs.

67.     Because Walgreens' scheme was kept secret, Plaintiff and the other members of the Classes were unaware of Walgreens' unlawful conduct alleged herein and did not know that they were paying artificially inflated prices for prescription generic drugs during the Class Period.

68.     Walgreens actively concealed its PSC prescription generic drug pricing scheme from the public, including Plaintiff and the other members of the Classes (and third-party payors), and failed to disclose the material fact that the prices Walgreens reported to third-party payors for the prescription generic drugs included on the PSC

formulary were far higher than the PSC Prices, and thus, not the actual "usual and customary" prices for those drugs. Walgreens charged Plaintiff and the other members of the Classes copayments for the drugs they purchased that reflected Walgreens' artificially inflated "usual and customary" prices. Walgreens also failed to post drug prices in a clear manner and in a way that would alert Plaintiff and the other members of the Classes to the artificially inflated prices charged by Walgreens. Through its actions, Walgreens misled Plaintiff and the other members of the Classes and caused them to pay to Walgreens inflated copayments for some of the most commonly prescribed generic drugs.

69. Walgreens' affirmative acts alleged herein, including acts in furtherance of its unlawful scheme, were wrongfully concealed and carried out in a manner that precluded detection.

70. Walgreens' unlawful pricing scheme was inherently self-concealing because it involved misrepresenting and falsely reporting the "usual and customary" prices for some of the most commonly prescribed generic drugs. If Walgreens had been open and notorious about its deceptive and unfair fraudulent pricing scheme, it would never have succeeded.

71. Plaintiff and the other members of the Classes could not have discovered the alleged unlawful activities at an earlier date by the exercise of reasonable diligence because Walgreens employed deceptive practices and techniques of secrecy to avoid detection of its activities. Walgreens concealed their activities by various means and methods, including affirmative misrepresentations regarding the actual "usual and customary" prices it charged for prescription generic drugs.

72. Because Walgreens affirmatively concealed its scheme, Plaintiff and the other members of the Classes had no knowledge until recently of the alleged unlawful activities or information which would have caused a reasonably diligent person to investigate whether Walgreens committed the actionable activities detailed herein.

73.    As a result of Walgreens' active concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiff and the other members of the Classes have as a result of the unlawful conduct alleged in this Complaint.

## COUNT I

**Against Defendants, on Behalf of the Subclass, for Violation of California Unfair Competition Law**

74.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.    Plaintiff brings this claim individually and on behalf of the members of the Subclass.

76.    Plaintiff and other members of the Subclass are "persons" within the meaning of Cal. Bus.  Prof. Code §17204.

77.    Walgreens has unfairly obtained monies from Plaintiff and the other members of the Subclass through Walgreens': (i) unlawful business acts and/or practices; (ii) unfair business acts and/or practices; and (iii) unfair, deceptive, untrue and/or misleading advertising (including violations of Cal. Bus. & Prof. Code §17500, *et. seq*.), including, among other things:

(a)    reporting to insurance companies, and state and federal health care entities fraudulent "usual and customary" prices for hundreds of generic prescription drugs;

(b)    misrepresenting to insurance companies and state and federal health care entities, Plaintiff, and the Subclass that the "usual and customary" price was greater than their copayments;

(c)    concealing from Plaintiff and the Subclass the true "usual and customary" prices of generic prescription drugs; and

(d)    wrongfully obtaining monies from Plaintiff and the Subclass as a result of Walgreens' deception.

78.     Walgreens willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive.

79.     The facts which Walgreen misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Plaintiff and the Subclass' decisions about whether to purchase generic prescription drugs from Walgreens, in that Plaintiff and the Subclass would not have purchased generic prescription drugs from Walgreens for more than the PSC Prices but for Walgreens' unfair and/or deceptive acts and/or practices.

80.     As a direct and proximate result of Walgreens' unfair and deceptive acts and/or practices, Plaintiff and the Subclass were deceived into paying falsely inflated prices for generic prescription drugs and have been damaged thereby.

81.     Walgreens are therefore liable to Plaintiff and the Subclass for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT II

### Against Defendants, on Behalf of the Subclass, for
### Violation of California Consumer Legal Remedies Act

82.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.     Plaintiff brings this claim individually and on behalf of the members of the Subclass.

84.     Plaintiff and other members of the Subclass are "consumers" within the meaning of Cal. Civ. Code §1761(d).

85.     The generic prescription drugs that Plaintiff and other members of the Subclass purchased from Walgreens are "goods" within the meaning of Cal. Civ. Code §1761(a).

86. Plaintiff and the other members of the Subclass" purchases were "transactions" within the meaning of Cal. Civ. Code §1761(e).

87. Walgreens is a "person" within the meaning of Cal. Civ. Code §1770(a).

88. Plaintiff and the other members of the Subclass have been damaged by Walgreens' unfair methods of competition, and/or unfair and/or deceptive practices, in violation of Cal. Civ. Code §1770(a), *et. seq.*, which occurred in connection with transactions which resulted in Class members' purchase of goods. These unfair methods of competition, and/or unfair and/or deceptive practices, included, among other things:

(a) reporting to insurance companies and state and federal health care entities fraudulent "usual and customary" prices for hundreds of generic prescription drugs;

(b) misrepresenting to insurance companies, state and federal health care entities, Plaintiff, and the Subclass that the "usual and customary" price was greater than their copayments;

(c) concealing from Plaintiff and the Subclass the true "usual and customary" prices of generic prescription drugs; and

(d) wrongfully obtaining monies from Plaintiff and the Subclass as a result of Walgreens' deception.

89. Walgreens willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive.

90. Pursuant to §1782 of the California Consumer Legal Remedies Act, on May 26, 2017, Plaintiff sent Walgreens in writing by certified mail notification of the particular violations of §1770 described above and requested that Defendants rectify their practices described above and give notice to all affected consumer of their intent to so act.

91.    The facts which Walgreens misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Plaintiff and the Subclass' decisions about whether to purchase generic prescription drugs from Walgreens, in that Plaintiff and the Subclass would not have purchased generic prescription drugs from Walgreens for more than the PSC Prices but for Walgreens' unfair and/or deceptive acts and/or practices.

92.    As a direct and proximate result of Walgreens' acts described above, Plaintiff and the other members of the Subclass paid more for Walgreens' products than they would have and/or purchased products they would not have purchased but for Walgreens' deceptive conduct.  Plaintiff and the other members of the Subclass therefore seek injunctive relief pursuant to §1782(d) of the Act, to enjoin Walgreens' ongoing wrongful acts described herein.

## COUNT III

**Against Defendants, on Behalf of the Class and Subclass, for Unjust Enrichment**

93.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.    By means of Walgreens' wrongful conduct alleged herein, Walgreens knowingly charge plan participants artificially high copayments for generic prescription drugs included in the PSC program in a manner that is unfair and unconscionable.

95.    Walgreens knowingly received and retained wrongful benefits and funds from Plaintiff and the Class and Subclass.  In so doing, Walgreens acted with conscious disregard for the rights of Plaintiff and the Class and Subclass.

96.    As a result of Walgreens wrongful conduct as alleged herein, Walgreens has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and the Class and Subclass.

97.    Walgreens' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

98.    Under the common law doctrine of unjust enrichment, it is inequitable for Walgreens to be permitted to retain the benefits it received, and are still receiving, without justification, from the imposition of artificially inflated prices on Plaintiff and the Class and Subclass in an unfair and unconscionable manner.  Walgreens' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

99.    Plaintiff and the Class and Subclass did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Walgreens to retain these wrongfully obtained proceeds.

100.    Walgreens are therefore liable to Plaintiff and the Class and Subclass for restitution in the amount of Walgreens' wrongfully obtained profits.

## COUNT IV

### Against Defendants on Behalf of the Class and Subclass for Negligent Misrepresentation

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    Under the circumstances alleged, Walgreens owed a duty to Plaintiff and the Class and Subclass to provide them with accurate information regarding the prices of its generic prescription drugs.

103.    Walgreens misrepresented and/or concealed the true "usual and customary" prices of generic prescription drugs that are included in the PSC program. Walgreens made such misrepresentations by reporting artificially inflated "usual and customary" prices for such drugs to third-party payors.

104.    Walgreens had no reasonable grounds to believe that these misrepresentations and/or omissions were true.  The prices that Walgreens reported to third-party payors were substantially (and unjustifiably) higher than the prices they charged under its PSC program to cash-paying customers.

105.   Walgreens intended to induce Plaintiff and the Class and Subclass to rely on its misrepresentations and/or omissions.  Walgreens knew that Plaintiff and the Class and Subclass would rely on its misrepresentations and/or omissions regarding "usual and customary" prices and, as a result, would pay copayments higher than the actual "usual and customary" prices for those generic prescription drugs.

106.   Plaintiff and the Class and Subclass justifiably relied upon Walgreens' misrepresentations and/or omissions in that Plaintiff and the Class and Subclass would not have purchased generic prescription drugs from Walgreens for more than the PSC Prices but for Walgreens' misrepresentations and/or omissions.  Plaintiff and the Class and Subclass' reliance on Walgreens' misrepresentations and/or omissions was, thus, to their detriment.

107.   As a proximate result of Walgreens' negligent conduct, Plaintiff and the Class and Subclass have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for Walgreens' misconduct.

108.   Walgreens are therefore liable to Plaintiff and the Class and Subclass for the damages they sustained.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Walgreens, and request as follows:

A.   That all Class members are owed at least the difference between their paid copayments and the  "usual and customary" price offered to the general public for all prescriptions purchased during the life of the PSC program;

B.   That the Court certify this action as a class action, proper and maintainable pursuant to  Rule 23 of the Federal Rules of Civil Procedure, and declare that Plaintiff is a proper  Class  representative;

C.   That the Court grant permanent injunctive relief to prohibit Walgreens from continuing to  engage in the unlawful acts, omissions, and practices described

herein;

D.     That the Court award compensatory, consequential, and general damages in an amount to be determined at trial;

E.     That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Walgreens as a result of its unlawful acts, omissions, and practices;

F.     That the Court award statutory treble damages, and punitive or exemplary damages, to the extent permitted by law;

G.     That the unlawful acts alleged in this Complaint be adjudge and decreed to be a violation of the unfair and deceptive business acts and practices in violation of the California Unfair Competition Law, and California Consumer Legal Remedies Act;

H.     That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees;

I.     That the Court award pre- and post-judgment interest at the maximum legal rate; and

J.     That the Court grant all such other relief as it deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 26, 2017

ROBBINS ARROYO LLP
GEORGE C. AGUILAR
GREGORY E. DEL GAIZO
STEVEN M. MCKANY

/s/*George C. Aguilar*
GEORGE C. AGUILAR
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E-mail: gaguilar@robbinsarroyo.com
gdelgaizo@robbinsarroyo.com
smckany@robbinsarroyo.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DAVID W. MITCHELL
BRIAN O. O'MARA
ARTHUR L. SHINGLER III
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
Facsimile: (619) 231-7423
davidm@rgrdlaw.com
bomara@rgrdlaw.com
ashingler@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
MARK J. DEARMAN
STUART A. DAVIDSON
JASON H. ALPERSTEIN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  (561) 750-3000
Facsimile: (561) 750-3364
mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com
jalperstein@rgrdlaw.com

Attorneys for Plaintiff

1149427